UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JAMES BRESNEN,

      Plaintiff,

            v.

JENNMAR CIVIL, LLC, et al.,

      Defendants.

Case No. 1:19-cv-779
JUDGE DOUGLAS R. COLE

## OPINION AND ORDER

This cause is before the Court on Jennmar's[1] Motion for Summary Judgment (Doc. 26). For the reasons discussed below, the Court **GRANTS** the Motion.

## BACKGROUND

James Bresnen worked for Jennmar from September 12, 2012, until he was fired on March 26, 2019. Jennmar is an engineering and manufacturing company that manufactures ground control parts[2] for the underground mining industry and for construction and tunneling projects. At the time he was fired, Bresnen served as General Manager of Jennmar Civil, a division of Jennmar. The reference to "Civil" denotes that this is the Jennmar division that provides services on civil projects, such as tunnel sewer repair, fabrication projects for the outside mining and tunneling

---

[1] "Jennmar" refers collectively to Defendants: Jennmar Civil, LLC and Jennmar of Kentucky.
[2] The parties used the term "ground control parts" in the statement of undisputed facts without explaining that the term means. From what the Court can tell, it appears to refer to equipment used to stabilize the ground for underground mining activities. In any event, exactly what constitutes "ground control parts" is not important to the outcome of this decision.

industries, soil stabilization, and foundation work. As General Manager of Jennmar Civil, Bresnen was responsible for leading a team engaged in sales, project management, and engineering for those types of projects.

When Bresnen became General Manager of Jennmar Civil, the group was losing money. Yet "Bresnen was able to turn Jennmar Civil around to profitability the last two years of his employment." (Resp. in Opp., Doc. 35, #1216[3]). Still, not all was going well for Bresnen at Jennmar. While Bresnen was helping to make Jennmar Civil profitable, he was also mired in various "personnel issues" within the group. (Calandra Dep., Doc. 22, #455).

Consider what one of Bresnen's managers, Al Campoli, said of Bresnen during this time. According to Campoli, Bresnen "was beginning to be unmanageable" and creating "a lot of drama … within the department." (*Id.* at #428). When the President of Jennmar, Tony Calandra, asked Campoli to explain what he meant by "drama," Campoli told Calandra that Bresnen was "playing people against one another." (*Id.* at #430). Bresnen, for example, would ask one Jennmar officer about the appropriate pricing on a project for a potential client. If Bresnen did not like the answer that officer gave, Bresnen would ask another officer to approve a lower price that Bresnen thought the client would accept. Bresnen would also yell and scream at Jennmar's plant employees. In fact, one plant manager, Joe Nash, "got to the point where he couldn't work with [Bresnen] anymore" because of Bresnen's "yelling and screaming." (*Id.* at #432). Compounding these problems was Bresnen's reluctance to delegate

---

[3] Refers to PageID#

more of his work to others. He would often second-guess his subordinates' decisions and get upset when they undertook various initiatives on their own.

But none of Bresnen's relationships at Jennmar were more fraught than his relationship with Jacob Hunter. Hunter was working for Jennmar Civil as an engineer when Bresnen joined the company. Once Bresnen joined the company, Hunter reported directly to him. Beginning in the last two years of Bresnen's employment, though, Bresnen began to fear that Hunter was out for Bresnen's job. James Pinkley, the person to whom Bresnen reported, offered a possible explanation for that fear: Pinkley observed that Hunter "kind of moved from being the engineer to being the No. 2 person in the organization, you know, below [Bresnen] as the General Manager." (Pinkley Dep., Doc. 34, #1147). Thus, suggested Pinkley, Bresnen's insecurity was growing in parallel with Hunter's stature within the company.

Whatever the cause, there's no doubt that Bresnen *was* worried about Hunter taking his job. Bresnen told Pinkley so directly. But Bresnen didn't stop there. Bresnen would call Calandra about it "at night … when [Bresnen] obviously had some alcohol in his system." (Calandra Dep., Doc. 22, #403). These late-night calls made Calandra worry about "unrest in the department" and the potential for that unrest to jeopardize "actual work getting done." (*Id.*).

An email that Hunter sent to Pinkley on January 16, 2019, offers a glimpse of that unrest. Hunter explained in the email that he was writing "to bring recent issues to light regarding conversations with Jim Bresnen." (Ex. E, Doc. 25-5, #601). Hunter

noted that "[t]here ha[d] been several issues in the past weeks that ha[d] triggered extreme responses from Jim Bresnen," and he provided a specific example from that very same day. (*Id.*). Specifically, Hunter recounted that, earlier in the day, he had sent an "email to gage [sic] the interest of a monthly conference call between [Jennmar] Civil and [Jennmar] Services." (*Id.*). Hunter thought "[t]his call would increase communication and reduce the potential for future conflicts of interests." (*Id.*). Indeed, Pinkley, along with another Jennmar officer, had requested such a call. What's more, Hunter called Bresnen the day before to give him advanced notice of Hunter's intent to send the email, to which Bresnen responded "OK" and raised no concerns about it. (*Id.*).

But when Hunter actually sent the email, Bresnsen did not react well, to put it mildly. After receiving the email, Bresnen asker Hunter to "call [Bresnen] immediately." (*Id.* at #602). According to Hunter, Bresnen "was displeased and irritated by the email." (*Id.*). Hunter claimed that the conversation "turned conspiratorial," with Bresnen accusing Hunter of trying to "replace [Bresnen] in the [General Manager] position of [Jennmar] Civil." (*Id.*). In response, Hunter told Bresnen that Hunter had "no desire to argue over an email request for an intercompany conference call or any other distracting issues moving forward." (*Id.*).

Hunter concluded his email to Pinkley conveying these facts by stating that it had "becom[e] increasingly exhausting to deal with the un-needed, dramatic, situations that [were] inhibiting [the] division's growth." (*Id.*). Two days later, Pinkley forwarded Hunter's email to Calandra in response to Bresnen's request for a

raise. In his email to Calandra, Pinkley acknowledged that Bresnen "need[ed]/deserve[d] a raise." (*Id.* at #600). But he also cautioned that Bresnen "need[ed] to become a General Manager and delegate to his talented team." (*Id.*). Pinkley added that "[t]he continued issues with [Bresnen's] handling of his personnel [were] taking away from what could be getting accomplished." (*Id.*).

About two months after Pinkley sent that email to Calandra, Calandra did what Bresnen had feared—Calandra fired Bresnen and installed Hunter as the new General Manager of Jennmar Civil. The specific catalyst for that decision involved a bid that another company—Wright Concrete and Construction, Inc.—submitted to handle a highway-soil-stabilization project for the West Virginia Division of Transportation. Wright and Jennmar were familiar with each other. Calandra indirectly owned a minority stake in Wright, and Wright was a long-time customer of Jennmar. As relevant here, Hunter worked with Wright to price out raw materials necessary for Wright to bid on the West Virginia project. When the time came for Wright to submit its bid, it listed Hunter as its supervising engineer for the project. That was a problem, however, because the Division of Transportation required the supervising engineer to be a full-time employee of the bidder, and Hunter was a full-time employee of Jennmar—not Wright. Not only that, but the supervising engineer also had to have qualifying experience from the past three years, and Wright's bid did not indicate that Hunter had the requisite experience.

When Hunter learned of these problems with Wright's bid, he became concerned, and he shared his concerns with Bresnen. Bresnen, in turn, relayed these

concerns to Calandra. But the pressure to correct the errors grew when GeoStabilization International ("GSI")—an unsuccessful bidder for the project—threatened to inform the Division of Transportation about these issues. Jennmar and Wright would eventually exchange drafts of an employee-sharing agreement that would allow Wright to list Hunter as Wright's supervisory engineer for the West Virginia project, but the issue became moot when Wright later dropped its bid on the project.

Around the time these events were unfolding, GSI offered Hunter a job as Mining Client Services Manager. The offer included a significantly higher compensation package than the one Hunter had been receiving, and Hunter made clear to Pinkley that he was seriously considering the offer. Hunter met with Calandra on March 26, 2019, to discuss the offer. When Calandra asked Hunter why he was thinking of leaving, Hunter explained that GSI's offer was hard to pass up, not just because of how financially attractive it was, but also because of "all of the drama" Hunter had been experiencing with Bresnen in the division. (Calandra Dep., Doc. 22, #483).

Calandra initially responded by offering Hunter a job developing a geotechnical division where, presumably, Hunter's compensation would have been higher, and Hunter would not have had to work as closely with Bresnen. (Unlike Jennmar Civil, the geotechnical division would focus on surface construction.) But, at some point, the two discussed the possibility of Hunter simply running Jennmar Civil without Bresnen. The bottom line was that Calandra wanted Hunter in Jennmar

Civil, and Calandra believed "[Hunter] couldn't continue working [at Jennmar Civil] if [Bresnen] was his boss." (Calandra Dep., Doc. 22, #483).

Calandra considered several factors in deciding whether to terminate Bresnen's employment and promote Hunter. Among them were: how Hunter and Bresnen had each performed within the division; how instrumental Hunter was to obtaining Jennmar's largest project the year before (the "Martin Marietta deal"); "continued personnel disruptions" caused, at least in Calandra's view, by Bresnen; and the fact that Hunter was a certified professional engineer, whereas Bresnen was not. (*Id.* at #483).

After speaking with other Jennmar officials, Calandra made his decision: Bresnen was out, and Hunter was in. When Calandra and Hunter spoke again, Calandra officially offered Hunter Bresnen's job, which Hunter accepted. Calandra explained that he wanted Hunter to run the entire Jennmar Civil division and develop the business to include geotechnical work. (Hunter Dep., Doc. 21, #328).

Calandra then called Bresnen to inform Bresnen of his termination, and Calandra had Hunter call some of Jennmar's customer to apprise them of the leadership change. Jennmar later offered Bresnen a severance package that would require Bresnen to execute a noncompete agreement, preventing Bresnen from working in the tunneling industry for some time. Bresnen refused the offer.

Following his termination, Bresnen filed a charge of age discrimination with the Equal Employment Opportunity Commission ("EEOC"), which, on September 11,

2019, closed Bresnen's case and issued him a notice of right to sue. Bresnen filed suit in this Court two days later.

Bresnen's Complaint (Doc. 1) alleges four counts: (1) age discrimination under the Age Discrimination in Employment Act, (2) age discrimination under Ohio Revised Code § 4112; (3) wrongful termination in violation of Ohio public policy; and (4) tortious interference with a business relationship. Jennmar has moved for summary judgment on all counts. The Motion (Doc. 26) has been fully briefed, and the matter is now ripe for the Court's decision.

## LEGAL STANDARD

"The 'party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *See, e.g.*, *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). But the non-moving party cannot defeat a motion for summary judgment merely by pointing to *any* factual dispute. As the Sixth Circuit has explained, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (bracket omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)).

In other words, the factual dispute must be such that, if the jury were to credit the non-moving party's version of the facts on the disputed issue, a reasonable jury could conclude that a verdict in the non-moving party's favor is warranted. Put differently, "to defeat a motion for summary judgment, the 'evidence' must be 'such that a reasonable jury could return a verdict for the non-moving party.'" *Morehouse v. Steak N Shake*, 938 F.3d 814, 818 (6th Cir. 2019) (quoting *Anderson*, 477 U.S. at 248). In short, "[t]he court must decide 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Int'l Outdoor*, 974 F.3d at 697 (quoting *Anderson*, 477 U.S. at 251–52).

## LAW AND ANALYSIS

**A.    The Court Grants Jennmar's Motion for Summary Judgment on Both of Bresnen's Age Discrimination Claims.**

### *1.    Jennmar Concedes that Bresnen Has Proven a Prima Facie Case of Age Discrimination.*

Although Bresnen brings two age-discrimination claims against Jennmar—one under Ohio law and one under federal law—the same analytical framework applies to both. That is because "[a]ge discrimination claims brought under Ohio law are analyzed under the same standards as federal claims brought under the Age Discrimination in Employment Act ("ADEA")." *Wharton v. Gorman-Rupp Co.*, 309 F. App'x 990, 995 (6th Cir. 2009) (citing *Minadeo v. ICI Paints*, 398 F.3d 751, 763 (6th Cir. 2005)).

Bresnen concedes he has no evidence of direct age discrimination, so he's left to prove his claim indirectly using the burden-shifting analysis of *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, the plaintiff first must establish a prima facie case of discrimination. "[I]n order to prove a prima facie case of discrimination, a plaintiff must show 1) that he is a member of a protected group, 2) that he was subject to an adverse employment decision, 3) that he was qualified for the position, and 4) that he was replaced by a person outside the protected class." *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003) (quoting *Kline v. TVA*, 128 F.3d 337, 349 (6th Cir. 1997)). For its part, Jennmar admits, at least for the sake of resolving the instant Motion, that Bresnen has proved a prima facie case of discrimination. (Bresnen was forty-seven years old when Jennmar fired him, and Hunter, who replaced him, was approximately thirty-one.) Thus, determining the appropriate result here turns on prongs two and three of the *McDonnell Douglas* analysis.

### 2. *Jennmar Has Articulated Legitimate Business Reason for Firing Bresnen.*

Under *McDonnell Douglas*'s second prong, the burden shifts to Jennmar to articulate a legitimate business reason for the adverse employment action. That is, Jennmar must introduce evidence which, "taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *Ohio Univ. v. Ohio Civil Rights Comm'n*, 887 N.E.2d 403, 423 (Ohio Ct. App. 2008) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

Jennmar has done that here. It cites many of the reasons noted above that Calandra gave for firing Bresnen: according to Jennmar (and Calandra), Bresnen was causing too many disruptions at Jennmar Civil, Hunter and Bresnen couldn't work

10

together, and Hunter was the better qualified candidate of the two because Hunter was certified as a professional engineer. Moreover, Jennmar notes in its brief that Hunter was the longer-tenured employee at Jennmar.

Plenty of evidence in the record supports Jennmar's articulated reasons. To recap: multiple people at Jennmar thought Bresnen was the source of too much "drama" at Jennmar Civil. Campoli thought Bresnen was nearly "unmanageable." (Calandra Dep., Doc. 22, #369). One of Jennmar's plant employees "got to the point where he couldn't work with [Bresnen] anymore" because of Bresnen's "yelling and screaming." (*Id.* at #432). Other employees thought that Bresnen critiqued and second-guessed their decisions too often, and Pinkley told Calandra that Bresnen "need[ed] to become a General Manager and delegate to his talented team." (Ex. E, Doc. 25-5, #600).

Then there was the drama surrounding Bresnen's (perhaps prescient) worry about Hunter taking Bresnen's job. That worry led Bresnen to call Calandra late at night complaining about Hunter, which, in turn, caused Calandra to worry about unrest in the division preventing "actual work getting done." (Calandra Dep., Doc. 22, #404). Bresnen's worrying also seems to have prompted, at least in part, his angry reaction to Hunter's email about setting up a call between Jennmar Civil and Jennmar Services.

As for Hunter's seemingly better qualifications, Bresnen does not dispute that Hunter, unlike Bresnen, was a certified professional engineer. Nor does Bresnen dispute that Hunter was the longer-tenured employee at Jennmar.

11

All told, Jennmar has put forth enough evidence to support its legitimate, articulated reasons for why it terminated Jennmar's employment. That evidence includes Bresnen's penchant for causing disruption within Jennmar Civil and Hunter's superior qualifications.

Indeed, Bresnen does not really dispute that Jennmar has introduced evidence which, "taken as true, would permit the conclusion that there [were] … nondiscriminatory reason[s] for" his firing. *Ohio Univ.*, 887 N.E.2d at 423. Instead, Bresnen argues that *other* evidence in the record shows that Jennmar's nondiscriminatory reasons are pretextual. That argument, however, goes to the third prong of the *McDonnell Douglas* test, which is the topic to which the Court turns next.

### 2.     *Bresnen Has Not Established That Jennmar's Legitimate Reasons are Pretextual.*

Under *McDonnell Douglas*'s third prong, the burden shifts back to Bresnen to show that Jennmar's proffered nondiscriminatory explanation is mere pretext for illegal discrimination. In terms of Bresnen's burden on this issue, though, the Sixth Circuit has cautioned that, to "survive summary judgment, the plaintiff need only produce enough evidence to support a *prima facie* case and to rebut, but not disprove, the defendant's proffered rationale." *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 957 (6th Cir. 2014).

The parties quibble over whether, at least in this case, Bresnen's *prima facie* case "combined with sufficient evidence to find that [Jennmar's] asserted justification lacks credibility [would] permit the trier of fact to infer that [Jennmar] was motivated by unlawful discrimination." (Resp. in Opp'n, Doc. 35, #1227) (citing *Reeves v.*

*Sanderson Plumbing*, 530 U.S. 133, 149 (2000)). But the Court need not settle that disagreement. That is because, even assuming that standard applies, Bresnen fails to put forth enough evidence to show that Jennmar's asserted justifications lack credibility.

That is not for want of trying, though. Bresnen advances several arguments in attempting to show pretext. None succeed. Bresnen argues, for example, that "Hunter could have been retained without terminating [Bresnen] because Hunter admitted that he told Calandra that [Hunter] was interested in running [Jennmar's] geotechnical surface construction business." (Resp. in Opp'n, Doc. 35, #1211). But Bresnen cites no authority suggesting that employers are required to make such an accommodation. And the Court doubts he could do so. The fact of the matter is that Calandra wanted Hunter at Jennmar Civil, but Calandra did not think Hunter could (or would) work under Bresnen any longer. As the Sixth Circuit has reasoned in the analogous Title VII context, anti-discrimination laws do not "diminish lawful traditional management prerogatives in choosing among qualified candidates." *Jackson v. Trinity Health-Michigan*, 656 Fed. App'x 208, 221 (6th Cir. 2016) (quotation omitted). "So long as its reasons are not discriminatory, an employer is free to choose among qualified candidates." *Id.* Indeed, an "employer has even greater flexibility in choosing a management-level employee, as is the case here, because of the nature of such a position." *Id.* To insist that Jennmar keep Bresnen employed because Jennmar could have simply moved Hunter to another division within the company would be to deny Jennmar that "flexibility." *Id.*

13

Next, Bresnen takes issue with some of the reasons that Calandra gave in his deposition testimony about why he terminated Bresnen's employment. These reasons included Bresnen's conflicts with other divisions over project pricing and Calandra's "unproven speculation [that] Bresnen drank excessively based on activities in his expense reports." (Resp. in Opp'n, Doc. 35, #1228). According to Bresnen, Calandra "concede[d] that … such behavior would normally be reflected in either a performance review or counseling of an employee." (*Id.*). Yet, Bresnen presses, "neither [Bresnen's] performance reviews nor his personnel file contain[s] any documentation of these alleged issues." (*Id.*).

Leave aside that Jennmar does not seem to rely on Calandra's perception of Bresnen's drinking or entertainment bills as justifications for firing Bresnen. Even so, Bresnen's argument at best misreads (at worst, misrepresents) Calandra's deposition testimony. Calandra did not concede that such behavior would "normally" be reflected in an employee's performance review or personnel file. (*Id.*). When asked whether such behavior would be "expect[ed] … to be noted on Mr. Bresnen's performance reviews," Calandra explained that "[i]t depend[ed] on the person giving the evaluation." (Calandra Dep., Doc. 22, #433). A short time later, Calandra was pressed again: "if it was a serious issue, you would expect it to be noted on a performance review, right?" Calandra responded, "[n]ot necessarily." (*Id.*). He explained that "[the performance reviews] don't encompass all issues." (*Id.*). Calandra also noted that "[t]here's verbal warnings as well as written." (*Id.*). Then, when asked about the lack of any written warnings in Bresnen's personnel file, Calandra

reiterated that Bresnen "got some verbal [warnings] from me." (*Id.* at #434).

So, again, Calandra's deposition testimony does not support Bresnen's argument that Bresnen's personnel issues would have shown up in Bresnen's performance reviews or personnel files had they been serious enough. Instead, Calandra's testimony makes clear that such issues were often addressed through verbal, as opposed to written, warnings. And Bresnen does not deny that he *was* given those verbal warnings.

Having failed to demonstrate any internal inconsistencies in Calandra's testimony, Bresnen tries to contradict Calandra's testimony with Pinkley's testimony. More specifically, Bresnen argues that, "[a]ccording to Pinkley, to the extent Bresnen and Hunter had any issues, they were both responsible and Pinkley believed Bresnen and Hunter 'needed to stay focused and stay in their lanes.'" (Resp. in Opp'n, Doc. 35, #1228 (quoting Pinkley Dep., Doc. 34, #1146–48)). This time, Bresnen appears to accurately characterize the testimony to which he is referring, but he has another problem: the point he is making is irrelevant.

The Court grants that Pinkley thought Bresnen and Hunter were, more or less, jointly responsible for their dysfunctional working relationship. Or, perhaps more accurately, it is at least ambiguous whether Pinkley thought Hunter was equally to blame. (Recall that Pinkley himself forwarded an email of Hunter complaining about Bresnen to Calandra and told Calandra that Bresnen "need[ed] to become a General Manager and delegate to his talented team." (Ex. E, Doc. 25-5, #600).) And the Court must (and does) resolve that ambiguity in Bresnen's favor, because Bresnen is the

non-moving party here.

But even spotting Bresnen that point, the Court is left to wonder: so what? Pinkley's testimony only confirms that Bresnen and Hunter's relationship *was* dysfunctional, which *reinforces* Jennmar's position that Calandra had to choose between the two. And besides, Bresnen has not directed the Court to any evidence that Pinkley ever communicated the view that the two were equally to blame to Calandra or anyone else who played a role in Bresnen's firing. Jennmar, on the other hand, *has* submitted evidence of Pinkley complaining about Bresnen's conduct to Calandra. So, to the extent there is any evidence of what *Calandra* knew about Pinkley's views on the Bresnen-Hunter feud, that evidence supports Calandra's view that Bresnen—not Hunter—was at fault.

To be sure, some employees reported having a good working relationship with Bresnen, as Bresnen notes. But it's hard to see how that detracts from the many other Jennmar employees and officers who reported having negative interactions with Bresnen over the years. And it says virtually nothing about the bad blood between Hunter and Bresnen. Among all the working relationships that Bresnen had at Jennmar, it was *that* relationship that gave Calandra the greatest cause for concern.

Nor is it availing for Bresnen to point to evidence that, as of March 4, 2019, Calandra had not been considering whether to fire Bresnen, and, instead, had said that Bresnen could expect to receive a raise. As Calandra explained in his testimony, which Bresnen does not rebut, Calandra gave raises to employees "based on sales." (Calandra Dep., Doc. 22, #437). So, even though some people, like Bresnen, "cause[d]

problems," if they sold "significant amount[s] of product," they were "going to get …
bonus[es]" anyway. (*Id.*).

It is also hardly surprising that Calandra was not thinking of firing Bresnen
as of March 4, 2019. Although Calandra was aware of the issues between Bresnen
and Hunter before then, Calandra was not *forced to choose* between Hunter and
Bresnen until a few weeks later when Calandra met with Hunter on March 26, 2019,
to discuss Hunter's offer from GSI. It was only then that Calandra fully realized that
"[Hunter] couldn't continue working [at Jennmar Civil] if [Bresnen] was his boss."
(*Id.* at #483), and that Jennmar was in danger of losing Hunter to GSI if Bresnen did
not leave.

Shifting gears and attacking Jennmar's reliance on Hunter's qualifications
does not help Bresnen's case, though that doesn't stop Bresnen from trying. Recall
that Jennmar pointed to the fact that Hunter, unlike Bresnen, was a certified
professional engineer. And Calandra testified that Hunter was "instrumental in
bringing in" the very lucrative Martin Marietta deal. (Calandra Dep., Doc. 22, #483).
Bresnen nonetheless insists that Jennmar should not have replaced him with Hunter.
This is because, according to Bresnen, "[t]here is no evidence in the record that the
job *required* an engineering degree." (Resp. in Opp'n, Doc. 35, #1211) (emphasis
added). Moreover, contends Bresnen, "[c]ontrary to Calandra's testimony, Pinkley
noted that Bresnen was the lead salesperson to land the Martin Marietta deal." (*Id.*).

These arguments fail, too. Jennmar does not claim that the job "required" an
engineering degree. According to Jennmar, Hunter's professional engineer license

was "merely an example of one objective qualification he possessed that [Bresnen] did not, and was one of the factors that Mr. Calandra considered when choosing between [Bresnen] and Hunter." (Reply, Doc. 36, #1299 n.4). And it seems indisputable that Bresnen's license counted as an "objective qualification." After all, Jennmar Civil worked on *engineering* projects, and the General Manager needed to be familiar with some engineering concepts, insofar as he had engineers reporting to him. Calandra also never claimed that Hunter was the "lead" Jennmar employee behind the Martin Marietta deal. Rather, Calandra said that Hunter was "instrumental in bringing in" the deal. (Calandra Dep., Doc. 22, #483).

Bresnen next tries to show pretext by arguing that Calandra fired Bresnen and replaced him with Hunter, at least in part, to cover up Wright's fraudulent bid on the West Virginia project. Even if Bresnen is right about those facts, and the record is far from clear that he is, this argument suffers from the same defect that so many of Bresnen's other arguments face: it is irrelevant. Terminating someone's employment to perpetuate fraud is, obviously, wrong, but it is not age discrimination.

In Bresnen's last-ditch attempt at showing pretext, he names several former employees who he claims were pushed out in favor of younger hires. In so doing, he gets some basic facts wrong. Those familiar with the departures of three such former employees, for example, said those employees voluntarily retired as opposed to being forced to leave. This Court need not credit Bresnen's conclusory and baseless assertions to the contrary, especially as he admits he was not familiar with *any* of the surrounding circumstances of *any* of the employees' departures. As for the former

18

employees who Jennmar *did* fire, the Court (again) need not credit Bresnen's conclusory and baseless assertions over the legitimate business reasons articulated by those actually familiar with the circumstances in support of those terminations.

The bottom line is this: after voluminous discovery in this case, the record is clear that Jennmar had several legitimate reasons to terminate Bresnen's employment. Those reasons include the fact that Bresnen did not work well with others and was feuding with one of Jennmar Civil's top performers—someone who the company was in danger of losing to a competitor if Bresnen did not leave. No evidence that Bresnen proffers, taken individually or in combination with any other evidence, creates a genuine dispute of material fact as to whether Jennmar's articulated reasons were pretextual. Jennmar is thus entitled to summary judgment on both of Bresnen's age-discrimination claims.

**B.** **The Court Grants Jennmar's Motion for Summary Judgment on Bresnen's Claim of Wrongful Termination in Violation of Ohio Public Policy.**

Bresnen's third claim alleges wrongful termination in violation of Ohio Public Policy. This claim arises from Wright's bid on the West Virginia project. Bresnen claims that both the bid and the employee-lease agreement that came after the bid were fraudulent, and that he was fired for raising the issue with management. Before explaining why this claim fails, too, some doctrinal background may be helpful.

Employment in Ohio, including employment with state or local government bodies, is generally governed by the employment at-will doctrine. *Wiles v. Medina Auto Parts*, 773 N.E.2d 526, 529 (Ohio 2002). Accordingly, an employer generally may

terminate an at-will employee for any reason at any time, and that terminated employee may not sue the employer for wrongful discharge. *Id.* But there are exceptions to this doctrine. One such exception, at issue here, allows a terminated employee to bring a wrongful discharge claim when the discharge violates public policy, which Ohio courts commonly refer to as a *Greeley* claim. *See Miracle v. Ohio Dep't of Veterans Servs.*, 137 N.E.3d 1110, 1113 (Ohio 2019) (citing *Greeley v. Miami Valley Maint. Contractors, Inc.*, 551 N.E.2d 981 (Ohio 1990)).

Prevailing on a *Greeley* claim requires that a plaintiff establish each of four elements: (1) that a clear public policy existed and was manifested either in a state or federal constitution, statute, or administrative regulation, or in the common law (the "clarity element"); (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize that public policy (the "jeopardy element"); (3) that the plaintiff's dismissal was motivated by conduct related to the public policy (the "causation element"); and (4) that the employer lacked an overriding legitimate business justification for the dismissal (the "overriding-justification element"). *Miracle*, 137 N.E.3d at 1113 (citing *Collins v. Rizkana*, 652 N.E.2d 653, 657–58 (Ohio 1995)). The first two elements—clarity and jeopardy—are questions of law for a court to decide, whereas the last two elements—causation and overriding-justification—generally involve factual issues for a factfinder to decide. *Collins*, 652 N.E.2d at 658.

The clarity element requires showing that (1) the policy is specifically set forth in a specific legal source, (the "specificity requirement"); (2) if the source is based on

Ohio's whistleblower statute, O.R.C. § 4113.52, that the plaintiff strictly complied with the statute's reporting requirements; and (3) if the source of the public policy is not Ohio's whistleblower statute, that the source of the public policy exhibits a "parallelism" with the whistleblower statute, (the "parallelism requirement"). *See Hale v. Mercy Health Partners*, 617 F. App'x 395, 403 (6th Cir. 2015) (citing *Dean v. Consol. Equities Realty #3, L.L.C.*, 914 N.E.2d 1109, 1112 (Ohio Ct. App. 2009)); *Kulch v. Structural Fibers, Inc.*, 677 N.E.2d 308, 323 (Ohio 1997). To establish "parallelism" with the whistleblower statute, the plaintiff must show that the legal source the plaintiff cites for the public-policy claim either (1) imposes an affirmative duty on employees to report a violation; (2) prohibits employers from retaliating against employees who file complaints on the topic; or (3) is designed to protect the public's health and safety. *Hale*, 617 F. App'x at 403.

The jeopardy element asks whether "dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy." *Miracle*, 137 N.E.3d at 1113. In conducting that inquiry, the Court must:

> (1) determine what kind of conduct is necessary to further the public policy at issue; (2) decide whether the employee's actual conduct fell within the scope of conduct protected by this policy; and (3) consider whether employees would be discouraged from engaging in similar future conduct by the threat of dismissal.

*Allman v. Walmart, Inc.*, 967 F.3d 566, 574 (6th Cir. 2020) (citing *Himmel v. Ford Motor Co.*, 342 F.3d 593, 599 (6th Cir. 2003)).

21

Bresnen's *Greeley* claim flouts these standards. Start with the first legal source that Bresnen cites in his Complaint: W. Va. Code § 5A-3-12(e). That statute fails to support Bresnen's *Greeley* claim because it is a *West Virginia* statute, and *Greeley* claims must be based on "Ohio or federal constitutions, statutes, or common law." *Eperesi v. Northernenvirotest Sys., Inc.*, 194 F.3d 1312 (6th Cir. 1999) (Table).

The second source that Bresnen cites is the Federal Occupational Health and Safety Act ("OSHA"), 29 U.S.C. 651 et seq. While that statute at least falls in a generally acceptable category (i.e., federal law), that particular statute doesn't work here because the public policy it embodies is workplace safety. *See Kulch*, 677 N.E.2d at 322. And that policy is not threatened by dismissing employees in circumstances like those in which Bresnen was dismissed (even accepting Bresnen's version of the facts). Any suggestion that workplace safety was implicated by Jennmar sharing Hunter with Wright so Hunter could work on the West Virginia project is far too attenuated. That is because Wright ultimately dropped its bid and Hunter never did any work on the West Virginia project, other than price out raw materials ahead of Wright submitting its bid. *Cf. Kulch*, 677 N.E.2d at 312 (holding that a plaintiff had a viable *Greeley* claim based on OSHA where the plaintiff had been fired for reporting "health problems from chemicals in the air, such as: acetone, styrene, epoxy resins, and cobalt mixes" (cleaned up)). Bresnen's reliance on OSHA thus fails *Greeley*'s jeopardy element. And the same problem bedevils the third legal source that Bresnen identifies in his complaint, O.R.C. § 4101.12, which is an Ohio workplace-safety statute.

Switching tack in his response brief, Bresnen attempts to locate a viable source of public policy in both Ohio's common law and an Ohio statute preventing telecommunications fraud, O.R.C. § 2913.05. These sources fail, too, as Bresnen does not show that either source (1) imposes an affirmative duty on employees to report a violation; (2) prohibits employers from retaliating against employees who file complaints on the topic; or (3) is designed to protect the public's health and safety. *Hale*, 617 F. App'x at 403; *see also Consol. Equities Realty #3, L.L.C.*, 914 N.E.2d at 1112. Nor can he rely on Ohio's whistleblower statute, O.R.C. § 4113.52, because he concededly has not complied with that statute's reporting requirements.

Ultimately, all of Bresnen's purported sources of public policy trip over either the clarity element or jeopardy element of his *Greeley* claim. Jennmar is thus entitled to summary judgment on this claim, too.

## C. Jennmar is Entitled to Summary Judgment on Bresnen's Tortious Interference Claim.

Bresnen's fourth (and final) claim is his tortious-interference claim. There he alleges that, after Jennmar fired him, Jennmar falsely asserted or suggested to other potential employers that Bresnen was subject to post-employment restrictions, including a non-compete agreement. Jennmar moves for summary judgment on this claim, laying out its evidence and arguments in its brief, yet Bresnen makes no argument defending his claim in response.

Although it would seem that Bresnen has abandoned this claim, the Sixth Circuit has said that even when a summary judgment motion is unopposed, the district court is required to "review carefully the portions of the record submitted by

23

the moving party to determine whether a genuine dispute of material facts exists." *Dunlap v. Sevier Cty., Tennessee*, No. 20-6216, 2021 WL 3123914, at *8 (6th Cir. July 23, 2021). Having undertaken that review here, the Court finds that the evidence overwhelmingly demonstrates that Jennmar did *not* falsely assert or suggest to anyone that Bresnen was subject to post-employment restrictions. It simply reached out to some of its customers to inform them that Hunter (and not Bresnen) would be their new point of contact at Jennmar Civil. Indeed, the Court suspects that the reason Bresnen did not respond to this part of Jennmar's Motion is because the record is so clear in this regard. Jennmar is thus entitled to summary judgment on Bresnen's tortious interference claim.

## CONCLUSION

For the reasons discussed above, the Court **GRANTS** Jennmar's Motion for Summary Judgment (Doc. 26) on all of Bresnen's claims. And the Court **DIRECTS** the Clerk to enter judgment accordingly and to **TERMINATE** this case on the Court's docket.

**SO ORDERED.**

September 21, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**

24